UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                           :

JOSEPH LICHTENSTEIN, *pro se*,          :
                           :
          Plaintiff,         :        **OPINION AND ORDER**
                           :
          -against-         :       07-cv-1653 (DLI)(LB)
                           :

REASSURE AMERICA LIFE INSURANCE   :
COMPANY, LIFE REASSURANCE       :
CORPORATION OF AMERICA,         :
DISABILITY MANAGEMENT SERVICES,  :
INC. and ROBERT D. HOFFMAN, Jr.    :
                           :
          Defendants.      :
------------------------------------------------------------x
                           :

JOSEPH LICHTENSTEIN, *pro se*,         :
                           :
          Plaintiff,         :
                           :        **OPINION AND ORDER**
          -against-         :
                           :       07-cv-1680 (DLI)(LB)
MASSACHUSETTS MUTUAL LIFE      :
INSURANCE CO., Ms. SUSAN RENTZ and :
Ms. SHEILA SACCO,          :
                           :
          Defendants.      :
                           :
------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

     *Pro se* plaintiff Joseph Lichtenstein, a former jeweler, suffers from a knee condition and

sought to collect benefits on two disability insurance policies. The insurers denied his claims,

and he filed the above captioned actions against them and their claims investigators, alleging

breach of contract, common-law fraud, wire and mail fraud, and violations of the Racketeer

Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968. In his amended

complaint in case number 07-cv-1653, he names as defendants Reassure America Life Insurance,

alternatively named as Life Reassurance Corporation of America ("Life Reassure"), Disability

Management Services ("DMS"), which investigates policy claims for Life Reassure, and Robert D. Hoffman, a DMS employee who investigated plaintiff's Life Reassure policy claim. Collectively, the 07-cv-1653 defendants are referred to herein as the "Life Reassure Defendants." In his amended complaint in case number 07-cv-1680, Lichtenstein names as defendants the Massachusetts Mutual Life Insurance Co. ("Mass Mutual") and two of its employees, Susan Rentz and Sheila Sacco, who reviewed and denied his Mass Mutual policy claim. Collectively, these defendants are referred to herein as the "Mass Mutual Defendants."

The two sets of defendants moved separately to dismiss the non-contract causes of action for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The plaintiff did not file responses to the motions, which are deemed unopposed.[1] The two complaints present similar facts and virtually identical legal issues. Accordingly, pursuant to the local rules of this district, the court designates the two cases as related and considers the motions in tandem.[2] For reasons set forth below, the partial motions to dismiss are granted.

## I.     Factual Background

The following facts are based on allegations from plaintiffs' two amended complaints with all plausible inferences drawn in his favor.

Plaintiff was a production manager and a partner in Hazel Jewelry Mfg., a jewelry-making concern. His primary duties included designing, shaping, cleaning, and plating jewelry, rolling gold, and producing boxes for jewelry. In May 1990, he purchased disability insurance policy no. h 428701 from Mutual Benefit Life of Newark, New Jersey. In the event of the

---

[1]     Plaintiff sent the court a "power of attorney" in which he assigned his representation in the two cases to an attorney, but no counsel has appeared in these two cases on his behalf.

[2]     In this district, a case may be designated "related" to another when, due to the "similarity of facts and legal issues . . . a substantial saving of judicial resources is likely to result . . . ." § 50.3 Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (including amendments through Jan. 29, 2009).

insured's disability, the policy would provide monthly payments of $4,080 for life with annual adjustments for inflation. This policy was later assumed by Life Reassure. In September 1992, plaintiff purchased disability insurance policy no. 9473357 from Mass Mutual. This policy provides disability benefits in the amount of $2,188 per month, and would also make upward adjustments for inflation.

In May 2001, he began to experience pain in his knees, which were later diagnosed with meniscus tears. The condition caused intermittent bouts of severe and uncontrollable pain that rendered him incapable of standing for long periods of time, moving heavy boxes and equipment, carrying chemical solutions, climbing ladders, and operating a kick press. His inability to complete these tasks consistently caused him to leave the partnership because his two partners, who are also his brothers, "did not want to continue payment[s]" to him due to his "limited capacity." (Pl.'s Am. Compl. ¶ 21, 07-cv-1653); *see also* (Pl.'s Am. Compl. ¶¶ 19 & 36, 07-cv-1680). After his employment with the firm was terminated, he sought to collect on the two disability insurance policies. His claims were denied by both insurers.

### A.    The Claim against the Reassure Defendants

Hoffman, the DMS employee who investigated plaintiff's claim on the Life Reassure policy, found plaintiff's debilitating knee condition to be intermittent. On August 14 and 21, 2002, he allegedly called and told plaintiff that, unless he underwent knee surgery, the claim would be denied. Plaintiff refused to undergo surgery and says Hoffman's statement was a knowing misrepresentation. By letter dated November 26, 2002, Hoffman denied plaintiff's claim. Thus, began a long running dispute between plaintiff and the Life Reassure Defendants over his entitlement to benefits. Plaintiff contends that defendants' subsequent letters to him were attempts to deceive and cheat him out of his policy coverage.

At the heart of this dispute appears to be a difference in the interpretation of the policy coverage language. Plaintiff did not attach a copy of the insurance agreement to his amended complaint, but both he and Hoffman, at least according to one of Hoffman's letters recounted in the amended complaint, appear to agree on the general wording of the coverage provision in the policy. The policy would pay disability benefits in the event that the insured becomes "totally disabled." (Pl.'s Compl. ¶ 22, 07-cv-1653). "Total disability" occurs when "the insured is not able to engage in his or her former occupation."[3] (*Id*.).

The two sides appear to differ over whether plaintiff can still engage in his former occupation. DMS and Hoffman denied the coverage claim on the grounds that plaintiff's condition was treatable and that plaintiff still had at least partial ability to do his past job. Plaintiff disputes this interpretation of the contract, which he says cannot possibly mean that an insured must be "a total vegetable" or "100% disabled to collect" and would be deemed ineligible if he retained just "one percent of the ability to work." (*Id*.). Instead, he argues that the policy's definition of total disability — as the inability to engage in former occupation — effectively "modifies the term total disability to mean a partial disability." (*Id*. at ¶ 42). This is because a partial disability can prevent an insured from continuing with a prior job.

Plaintiff argues that, in his case, his entitlement to collect on the policy is determined by his inability to continue with his former occupation. When the pain in his knees intermittently flared up, it was so severe that he could not perform certain tasks of his job. In turn, this occasional disability prevented him from performing his employment functions on demand and led to the "total termination of his employment." (*Id*. at ¶ 54). He explains that his jewelry-

---

[3]     Hoffman is quoted as stating that an "'insured is totally disabled when due to sickness or injury, either: a) the insured is no longer able to work in his former occupation; or b) the monthly-earned income is reduced to one fourth or less of his or her indexed prior monthly earned income.'" (Pl.'s Am. Compl. ¶ 49, 07-cv-1653 (quoting Hoffman's letter to plaintiff (April 15, 2003) ))

making partnership was formed out of fear that the partners would compete against one another if they were to split. Once he became partly disabled, however, the threat of his becoming a competitor diminished and his partners no longer wished for him to stay in the partnership. He reasons that, since it was beyond his control to force his partners to keep him in the partnership, his departure due to his knee condition was "as if [he] was fired because of partial disability." (*Id*. at ¶ 53). Extending this reasoning a bit further, he asserts that "even [a] one percent disability of my former occupation was technically enough for me to lose my job at Hazel Mfg." (*Id*.). In addition to his knee problems, plaintiff also indicates that he took a leave from his job in the summer of 2001 due to "lack of production" at the business. (*Id*. at ¶ 58).

He vigorously disputes DMS and Hoffman's position that he needed to be totally disabled to collect benefits, and says their denial letters dated November 26, 2002, April 15, October 9, and November 13, 2003 are all examples of fraud. In each, Hoffman denied his claim for lack of total disability and refused, in plaintiff's words, to "honor" the modification of the meaning of total disability as is defined in the policy. (*Id*. at ¶ 74). He calls Hoffman's denials the "total disability trick". (*Id*. at ¶ 73).

Hoffman's April 15, 2003 denial letter to plaintiff and the latter's vigorous rebuttal in the rambling amended complaint provide a good cross section of what plaintiff considers to be misrepresentations aimed at deceiving him. In this letter, Hoffman wrote that: (1) the insurance policy did not provide for partial benefits in the event of a partial disability; (2) recognized plaintiff's difficulty in operating the kick press but found no evidence that this prevented him from continuing with his prior occupation; and (3) recalled being told by one of plaintiff's partners that plaintiff's termination due to tardiness and poor attendance and family frictions. Hoffman also cited plaintiff's treating physician, who described plaintiff's condition as treatable

and occupation as sedentary, as well as a consulting physician, who found plaintiff to be walking with a normal gait. Hoffman also referenced plaintiff's own description of his job responsibilities in 1990, which was said to be 85% administrative and 15% supervisory. Finally, Hoffman noted the findings of an ergonomic mechanical consultant, who reported that the kick press could be replaced by an alternative press controlled by electronic buttons.

Plaintiff counters that each of those points are "fraudulent[,] lies[,] omissions and half truths" designed to trick him into forgoing his claim. (*Id*. at ¶ 72). He calls Hoffman's initial point another attempt at the "total disability trick." Though the insurance agreement may not pay partial benefits for partial disability, he reasons that it must still pay him full benefits because he is unable to continue at his job due to a partial disability. Plaintiff attributed his tardiness and poor attendance in 2001 to his knee problems. The family frictions that his brother spoke of was tension in the family-run partnership stemming from his lack of production due to his knee condition. That his knee condition is somehow treatable has no bearing on his entitlement to receive benefits, plaintiff argues, because the policy does not explicitly require his submission to treatment as a condition for paying benefits and cannot otherwise force him to undergo surgery. That his treating physician described his job as sedentary is not meaningful because the doctor never visited his workplace and never saw the demands placed upon him. The consulting doctor's findings were based on an incomplete record assembled by Hoffman, who excluded two reports by plaintiff's treating physician describing his intermittent pain. Instead, Hoffman included a surveillance video tape showing plaintiff walking normally at a time when he was not experiencing his knee pain. His job description circa 1990 does not preclude the fact that supervisory tasks could involve extensive periods of standing. Furthermore, he reasons, since "nowhere in the policy does it state[] that job descriptions can't change", he would still be

covered for disability insurance if he were "a jeweler one day and an electrician the next." (*Id*. at ¶ 66). Finally, he says the alternative palm-button operated press is unsafe and could chop off a finger. Its use would place him in a predicament: either he should lose insurance benefits or lose a finger.

Plaintiff states that Hoffman ought to have known the untruthfulness of the points made in the letter because he had already received plaintiff's rebuttals. Plaintiff avers that DMS and Hoffman were paid more by Life Reassure to deny claims that they investigate, which motivates them to deceive claimants. Alternatively, he avers that DMS and Hoffman routinely denied claims and prolonged investigations to inflate the fees they charged to Life Reassure and "milk" the insurer. (*Id*. at ¶ 76 & 85). He claims that such practices are common in the insurance industry and "highly true in []his case because so many points were lied about." (*Id*. at ¶ 76).

Plaintiff contends that discovery will uncover the evidence of the scope of the "malicious actions", which are currently in the exclusive possession of the defendants. He claims that "in all probability that there are very good chances [sic.] that others have been lied to[,] cheated and taken for a ride as Plaintiff was." (*Id*. at ¶ 80). He filed the Life Reassure action on April 20, 2007. In addition to breaching the insurance agreement, he accuses Life Reassure, DMS and Hoffman of using interstate mail and wires to commit fraud and racketeering. He asks for punitive damages and treble damages under RICO.

**B.     The Claim against the Mass Mutual Defendants**

On September 11, 2002, plaintiff's claim for disability benefits on his Mass Mutual policy was denied in a letter by Rentz. Subsequent denial letters were sent on October 8, 2002, January 3, 2003, October 8, 2003 and July 15, 2004.

The dispute in this case, like that with the Life Reassure Defendants, turns on the

interpretation of the insurance agreement. According to plaintiff, the terms of the Mass Mutual policy indicate that "total disability" occurs when "'the insured is not able to perform the substantial and material duties of the regular occupation.'" (Pl.'s Am. Compl., 07-cv-1680, at ¶ 20). Again, he interprets this clause to mean that the insured does not "have to be completely disabled (a vegetable) to be considered totally disabled", and concludes that he is eligible for coverage because his intermittent knee pain prevents him from performing certain tasks, which are material duties of his job. (*Id.*; *see also id.* at ¶ 47). Mass Mutual emphasized in correspondence with him that, under the policy, the insured's loss of income must be due to a disability which limited him from performing the substantial and material duties of his occupation, not simply his particular job. Its examiners, Rentz and Sacco, repeatedly pointed to his ability to do some work and the fact that he was bought out of the partnership by his brothers as reasons for denying his claim. Plaintiff considers the defendants' denials based on his residual capacity to work to be both meaningless and in bad faith.

Rentz listed Mass Mutual's main points in the denial letter dated January 9, 2003. In this letter, she wrote that the plaintiff's condition was not very restricting and cited a report by Mass Mutual's medical consultant who found plaintiff to be taking only over-the-counter analgesics but no prescription pain medicine. She pointed out that plaintiff had left work under mutual agreement with his brothers/business partners, of his own volition, not at the direction of a doctor, and spent August 2001 rebuilding his family home. Finally, she noted that he had professed belief in his ability to work against his brothers in the future.

Plaintiff considers all of these points to be deliberate mischaracterizations or outright deception. He asserts that Rentz must have withheld portions of his treating physician's report from Mass Mutual's medical consultant because he was prescribed prescription-strength Aleve.

He contends that he left the partnership because of his knee condition, and did not need a doctor's directive to rest his knee in the summer of 2001 because it is what "human beings do when their legs ach [sic.]" (Pl.'s Am. Compl., 07-cv-1680, at ¶ 35). His knee condition also forced him to cease working on his house. He faults Rentz for deliberately mischaracterizing his interview with a Mass Mutual investigator, Tom Moynihan. Moynihan reported the plaintiff as saying that he had "the right to return to work in the future if he could perform his share of the work in the production area or possibly become a competitor against his brothers." (*Id.* at ¶ 38). Based on this statement, plaintiff argues that he never actually said he would be able to work in the future under his existing condition.

Plaintiff continued to press for his benefits with Rentz's successor Sacco, without success. He accuses both of deliberately withholding information to mislead Mass Mutual's medical consultant and mischaracterizing reports and interviews. He alleges that Mass Mutual had an agreement with Rentz and Sacco to pay them more if they "successfully" denied a claim and "probably paid" Rentz and Sacco extra to deny his claim or that the employee defendants were motivated to split the gains from the denial of his benefits with Mass Mutual. (*Id.* at ¶¶ 23, 61 & 82). He calls this a common practice by insurance companies to pay examiners more for "better results," and accuses Mass Mutual of encouraging fraudulent denials. (*Id.* at ¶ 23).

He filed the action against the Mass Mutual Defendants on April 13, 2007. In addition to the breach of contract and fraud claims, he also asserts that Mass Mutual, Rentz, and Sacco are each a person conducting the affairs of an association-in-fact enterprise comprised of the three and other Mass Mutual employees through a pattern of racketeering activity such as kickbacks, deliberate omissions to mislead, and mail and wire fraud. He alleges that other victims have or will be defrauded by defendants.

## II.    Standard of Review

Plaintiff's submissions are held to less stringent standards than formal pleadings drafted by a lawyer because he proceeds *pro se*. *See Hughes v. Rowe*, 449 U.S. 5, 9 (1980); *see also Ferran v. Town of Nassau*, 11 F.3d 21, 22 (2d Cir. 1993).  The district court reviews *pro se* papers "liberally, and interprets[s] them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).  This allowance, however, "does not exempt a party from compliance with relevant rules of procedural and substantive law." *See Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (internal quotation marks omitted).

### A.    Standard of Review for Unopposed 12(b)(6) Motion

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to make a motion to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  On such a motion, the court looks "only to the allegations of the complaint and any documents . . . incorporated by reference in the complaint" and makes "all reasonable inferences that can be drawn from such allegations and documents in the light most favorable to the plaintiff." *Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir. 1999).   In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court rejected the "oft-quoted" standard set forth half a century ago in *Conley v. Gibson*, 255 U.S. 41 (1957), that a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 255 U.S. at 45-46.  The Court "retire[d]" *Conley*'s "no set of facts" language in favor of the requirement that plaintiff plead enough facts "to state a claim for relief that is *plausible* on its face." *Twombly*, 127 S. Ct. at 1974. (emphasis added).  Under *Twombly*, a complaint cannot

make merely "a formulaic recitation of the elements of a cause of action," but must allege facts that "raise a right of relief above the speculative level . . . on the assumption that all allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1964-65 (citations omitted). The Second Circuit has interpreted the foregoing language to "requir[e] a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*," rather than to mandate a "universal standard of heightened fact pleading." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007), *cert. granted sub nom. Ashcroft v. Iqbal*, 2008 WL 336310 (June 16, 2008) (emphasis in original).

The court typically applies the same Rule 12(b)(6) standard to unopposed motions to dismiss; however, where a party is proceeding *pro se*, the court is still obliged to "'read the pleadings . . . liberally and interpret them to raise the strongest arguments that they suggest." *Johnson v. New York*, 256 F. Supp. 2d 186, 188 (S.D.N.Y. 2003) (quoting *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (internal quotation marks omitted)).

**B.      Rule 9(b)'s Heightened Pleading Standard**

Federal Rule of Civil Procedure 9(b) sets forth a heightened pleading standard for allegations of fraud: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). The particularity requirement functions "to provide a defendant with fair notice of a plaintiff's claim" and "to safeguard a defendant's reputation from improvident charges of wrongdoing." *O'Brien v. Nat'l Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991). To properly plead fraud pursuant to Rule 9(b), a "'complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the

statements were fraudulent.'" *Lerner v. Fleet Bank*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally. FED. R. CIV. P. 9(b). The relaxation of Rule 9(b)'s specificity requirement regarding scienter is not a license to base fraud claims on speculation and conclusory allegations. *Lerner*, 459 F.3d at 290. Plaintiff must allege facts that give rise to a strong inference of fraudulent intent, which may be established either by alleging facts (a) to show that defendants had both motive and opportunity to commit fraud, or (b) that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Id.* at 290-91 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) (internal quotation marks omitted).

Allegations of fraud based on information and belief generally do not satisfy Rule 9(b), except for matters that are "'peculiarly within the opposing party's knowledge,'" in which case Rule 9(b) permits information and belief allegations so long as they are "accompanied by a statement of facts upon which the belief is founded." *Luce v. Edelstein*, 802 F.2d 49, 54 n. 1 (2d Cir. 1986) (quoting *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974)).

Rule 9(b) also is strictly applied to pleadings of fraud as predicate acts in support of a civil RICO claim because the mere initiation of a RICO action against a defendant can "unfairly stigmatize him as a 'racketeer.'" *Plount v. Am. Home Assurance Co.*, 668 F.Supp. 204, 205 (S.D.N.Y. 1987). Therefore, "courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Figueroa Ruiz v. Algeria*, 896 F.2d 645, 650 (1st Cir. 1990).

## III. Discussion

### A. Sufficiency of the Pleadings as to the Grand Fraud Scheme

In each of the two amended complaints, plaintiff refers to specific communications

containing allegedly misrepresentative statements, as well as to a broad scheme by the insurer in each case to defraud their insureds by kicking back a portion of the insured's denied benefits to the claims investigators as a way to encourage denials of coverage. Plaintiff claims that this kickback scheme is common in the insurance industry and will be exposed through his lawsuits. He has not, however, provided any specific facts to support any aspect of these sweeping fraud allegations. The court will address the specific allegations of fraud in turn, but finds, as an initial matter, that the grand allegations of fraud through kickbacks fail to meet Rule 9(b)'s heightened pleading standards.

In both cases, plaintiff alleges that it is a common practice in the insurance industry for insurers to pay claims investigators and examiners, whether contractors or in-house, a premium for each claim they reject over each claim they grant. Plaintiff asserts that, at the minimum, it is commonly known that insurance companies engage in this practice that provides an improper incentive for claims examiners and investigators to defraud policyholders and deny claims wrongfully. Plaintiff provides no facts whatsoever to support these allegations, but claims that he was personally victimized by this practice in both cases.

In the case against the Life Reassure Defendants, he alleges that Life Reassure induced DMS to deny his claim through such an incentive scheme, which was then executed by Hoffman. He alleges alternatively, however, that DMS and Hoffman repeatedly and fraudulently denied his claim for coverage to prolong their investigation of his claim and pad their bill to Life Reassure. In this alternative scenario, plaintiff casts himself to be an indirect victim of a fraud by DMS and Hoffman against Life Reassure. In the case against the Mass Mutual Defendants, he alleges that Mass Mutual agreed to pay Rentz and Sacco more if "they succeeded in denying his claim", that it "probably paid" them extra to deny his claim, or that the defendants would split the savings to

Mass Mutual if he was induced to drop his claim or accept less than what the policy guaranteed. There is no when, where and how to support any of these allegations. They rely on pure speculation.

Plaintiff asserts that he is entitled to discovery on the grand fraud claims because the probative information is within the exclusive possession of defendants. An exception to Rule 9(b)'s particularity requirement permits the pleader to base allegations on information and belief when the matter is peculiarly within the opposing party's knowledge. That requirement, however, requires the pleadings to be accompanied by a statement of facts upon which the belief is founded. *Luce*, 802 F.2d at 54 n.1 (citing *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir.1972)). Plaintiff has provided no accompanying statement of facts that would make the allegations plausible.

The only factual averments remotely related to the kickback scheme are defendants' repeated denials of his policy claims and a communication between one of Mass Mutual's employees and Hoffman. Plaintiff points to a telephone memo that Rentz wrote on December 10, 2002 ostensibly documenting a telephone call from Moynihan of Mass Mutual to Hoffman at DMS to "talk about their game plan." (Pl.'s Am. Compl. ¶ 58, 07-cv-1680). This "game plan," plaintiff argues, was the scheme that the insurers used to defraud him, though he does not allege that the two sets of defendants acted in concert. While it is certainly possible that the investigators for the two insurers had communications, especially since plaintiff forwarded reports prepared by one insurer to the other, the alleged mention of a "game plan" in one telephone call, by itself, does not render his allegations of a common kickback scheme plausible, especially when all the pieces of the grand scheme remain so speculative. The amended complaints simply do not contain sufficient factual allegations to amplify and elevate the

sweeping charges from possible to plausible, and plaintiff is not entitled to plead such schemes upon information and belief.

Thus, plaintiff's allegations of a grand fraud scheme by the insurance industry fail to meet the heightened pleading standards of Rule 9(b) and the plausibility standard under *Twombly*. The court now turns to the specific fraud allegations.

**B.      Common-Law Fraud**

A claim for fraud under New York law must allege that "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996) (internal quotation marks omitted)); *see also Lerner*, 459 F.3d at 291; *Vermeer Owners, Inc. v. Guterman*, 78 N.Y.2d 1114, 1116 (1991) (listing the elements of a common-law fraud claim in New York as "representation of material fact, falsity, scienter, reliance and injury").

As a general rule, a claimant cannot "recast" what is in substance a breach of contract claim as an action for fraud.  *See Wall*, 471 F.3d at 416, *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 294 (2d Cir. 1986); *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) ("Contractual breach, in and of itself, does not bespeak fraud, and generally does not give rise to tort damages."). As such, a general assertion that the defendant entered into a contract without the intent to perform is insufficient to support a fraud claim.  *See N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995).

To bring an independent fraud claim alongside a contract claim, the plaintiff must: "(i) demonstrate [that the defendant has] a legal duty separate from the duty to perform under the

contract: or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Int'l Design Concepts, LLC v. Saks Inc.*, 486 F. Supp. 2d 229, 237 (S.D.N.Y. 2007) (quoting *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 20 (2d Cir.1996)) (internal quotation marks omitted).

Plaintiff's New York common-law fraud claims fail in both cases because they are actually disputes over insurance contracts. Furthermore, plaintiff cannot show any detrimental reliance on the fraud, and cannot depend on reliance by third parties.

It is apparent from the amended complaints that plaintiff disagrees with defendants over the insurance policies' extent of coverage. Plaintiff does not allege any misrepresentations prior to his purchase of the insurance policies. Rather, all of the specific instances of alleged misrepresentations occurred after he tried to collect on the insurance policies, at which point defendants allegedly tried to deceive him, his physician and the consulting physicians into believing that he is not entitled to coverage. The disputes are over contractual terms that are central, not collateral to the insurance agreements. There is no evidence that he was induced to sign the contracts by other collateral terms. Aside from the insurance contracts, defendants owe no other duties or obligations to him. He has not shown any damages separate from breach of contract damages. *See Deerfield Commun. Corp. v. Chesbrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986) (affirming plaintiff's right to recover special damages resulting from fraud in the inducement that are otherwise not unrecoverable under the contract). Plaintiff cannot satisfy the exceptions to the general rule precluding fraud claims from contractual relationships. Therefore, his common-law fraud claims cannot be made independent of his breach of contract claims, and must be dismissed.

Plaintiff also cannot demonstrate reliance, a key element of common-law fraud. Even if defendants' statements to him are in fact false, there is no evidence that he relied on the statements to his detriment. On the contrary, his vigorous appeals against the repeated denials of coverage and refusal to undergo surgery belie *any* reliance on defendants' misrepresentations. Plaintiff also suggests that he relied on defendants' promises of fair investigations into his claims, and "was taken for a ride" while defendants "pretend[ed] to investigate matters." (Pl.'s Am. Compl. ¶ 58, 07-cv-1680). This reliance on the investigation, however, was not the cause of his injury. His claims for damages arise out of the denials of coverage.

Finally, he cannot base his fraud claim on the misrepresentations made to third parties or omissions withheld from and relied upon by third parties. *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196-97 (2d Cir. 1998).

The common-law fraud claims are thus dismissed.

### C.    Mail and Wire Fraud Claims

Plaintiff also alleges wire and mail fraud pursuant to 18 U.S.C. §§ 1341 & 1343. Federal statute criminalizes the use of mail or wire transfers in furtherance of any scheme to defraud with money or property as the object of the scheme. *See* 18 U.S.C. §§ 1341, 1343 (2006). The statutes, however, do not provide a private right of action. *See Official Publ'ns, Inc. v. Kable News Co.*, 884 F.2d 664, 667 (2d Cir. 1989). Thus, plaintiff cannot assert wire and mail fraud as independent claims, distinct from his RICO claims, which are discussed below.

### D.    Civil RICO Claims

Congress enacted RICO in 1970 to combat organized crime, and the statute aims to prevent organized criminals and racketeers from financially infiltrating legitimate businesses thereby affecting interstate commerce. *See United States v. Porcelli*, 865 F.2d 1352, 1362 (2d Cir.

1989). The RICO statute creates three substantive offenses and one non-substantive offense that are criminally and civilly actionable. *See* 18 U.S.C. §§ 1962 & 1964(c) (2006); *H. J. Inc. v. Northwestern. Bell Tel. Co.,* 492 U.S. 229, 232-33 (1989). It proscribes any person from: (1) using income derived from a pattern of racketeering activity to invest in an enterprise engaged in interstate commerce, 18 U.S.C. § 1962(a); (2) acquiring or maintaining control in such an enterprise through a pattern of racketeering activity, *id.* at § 1962(b); (3) conducting the affairs of such enterprise through a pattern of racketeering activity, *id.* at § 1962(c); or (4) conspiring to commit one of the first three offenses, *id.* at § 1962(d). In both cases, plaintiff asserts his RICO claims under sections 1962(c) and (d).

A plaintiff stating a claim for civil RICO has two pleading burdens. *See Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983). He must allege that: (1) the defendant violated a subsection of 18 U.S.C. § 1962, and (2) he was "injured in his business or property by reason of [that] violation." *Id.* (quoting 18 U.S.C. § 1964(c)). To establish a claim for a civil violation of section 1962(c), "a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeer activity." *Cofacredit v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 242 (2d Cir. 1999) (quoting *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 520 (2d Cir. 1994)). Each element of a RICO offense must be established as to each individual defendant. *See United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987).

### 1.    Statute of Limitations

As an initial matter, the court finds plaintiff's civil RICO claims in both actions to be time-barred. The statute of limitations for a civil RICO claim is four years. *McLaughlin v. Am. Tobacco Co.*, 522 F3d 215, 233 (2d Cir. 2008) (citing *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987)). The statute begins to run when the plaintiff

"discovers—or should reasonably have discovered—the alleged injury." *Id.* (citing *Rotella v. Wood*, 528 U.S. 549, 553-54 (2000)). Plaintiff filed the action against the Life Reassure Defendants on April 20, 2007, and the action against the Mass Mutual Defendants on April 23, 2007. More than four years before these filing dates, plaintiff had already learned of his injuries and had sufficient facts to develop the theories he is using in the claims against each set of defendants.

By April 20, 2003, he had already had the conversations with Hoffman about his surgery (August 2002) and received Hoffman's rejection letters (dated November 26, 2002 and April 15, 2003). From these communications, plaintiff learned that the Life Reassure Defendants considered him not to be "totally disabled," a designation that he has always rejected based on his understanding of the contract language. For example, he was told by Hoffman in August 2002 that he would need to undergo surgery in order to receive benefits for the condition. He avers that Hoffman also told him that this surgery requirement was based on a case precedent which was then sent to him. In December 2002, plaintiff then wrote to Hoffman and pointed out that the case law actually stands for the proposition that an insurer may require surgery as a condition for paying benefits only if such requirement was written into the policy. The absence of such a requirement in his policy combined with Hoffman's knowledge of this fact, he argues, made Hoffman's statements knowing misrepresentations. This sequence of events, among others, led him to conclude that the Life Reassure Defendants were knowingly trying to deceive him. Plaintiff discovered his injury well before April 20, 2003, which makes the action he filed four years later untimely.

Similarly, by April 23, 2003, plaintiff had received denial letters dated September 11 and October 8, 2002 and January 9, 2003 from Rentz and Mass Mutual, containing what he considers

to be knowing misrepresentations of the contract's meaning, as well as his personal, business and family situation. These misrepresentations, in turn, form the mail fraud predicate acts of his RICO claims in the Mass Mutual action. Hence, the RICO claim against the Mass Mutual defendants is also untimely.

Even if plaintiff's RICO claims were timely filed, they would still be dismissed because he cannot demonstrate a pattern of racketeering activity.

### 2. Pattern of Racketeering Activity

"Racketeering activity" under the RICO statute refers to "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year" or any act criminally indictable pursuant to designated provisions of the United States Code. 18 U.S.C. § 1961(1) (2006). Section 1961(1) provides an exhaustive and exclusive list of federal and state criminal offenses that may serve as predicate acts; among them are wire and mail fraud. *See Dempsey v. Sanders*, 132 F. Supp. 2d 222, 226 (S.D.N.Y. 2001); *Red Ball Interior Demolition Corp. v. Palmadessa,* 874 F. Supp. 576, 586 (S.D.N.Y. 1995). To establish a pattern of racketeering activity, the plaintiff must demonstrate at least two predicate acts of such activity committed within a ten-year period. *See* 18 U.S.C. § 1961(5) (2006). The predicate acts must also be "related" and "amount to or pose a threat of continued criminal activity." *Cofacredit v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 242 (2d Cir. 1999) (quoting *H. J. Inc.*, 492 U.S. at 239).

### a. Mail and Wire Fraud as Predicate Acts

Allegations of mail and wire fraud must set forth: "(1) the existence of a scheme to defraud, (2) the defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or transmission facilities in furtherance of the scheme." *S.Q.K.F.C., Inc. v. Bell*

*Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 633 (2d Cir. 1996). Like all averments of fraud, a plaintiff must plead wire and mail fraud with the requisite particularity demanded by Fed. R. Civ. P. 9(b). *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (citing *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004); *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) (requiring allegations of predicate mail and wire fraud acts "should state the contents of the communications, who was involved, where and when they took place, and explain why they were fraudulent"); *Morrow v. Black*, 742 F. Supp. 1199, 1203 (E.D.N.Y. 1990) (discussing pleading requirements for predicate acts of mail fraud and wire fraud).

Unlike a common-law fraud pleading, a plaintiff can plead mail and wire fraud as predicate acts without having to show his own reliance on the fraud. The Supreme Court recently held that a plaintiff asserting a civil RICO claim predicated on mail or wire fraud "need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations." *Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131, 2145 (2008). This is so because the RICO statute conferring a private cause of action does not specify first-party reliance, and a plaintiff could be injured by racketeering activity even if he or she did not rely on the defendant's statements. The Supreme Court went so far as to declare that mail and wire fraud could constitute a predicate act for a civil RICO pleading "even if no one relied on any misrepresentation." *Id.* at 2138. It did qualify that a plaintiff is unlikely to prove injury and recover damages "without showing that *someone* relied on the defendant's misrepresentations." *Id.* at 2144 (emphasis in original). Thus, plaintiff's lack of reliance, which was fatal to his common-law fraud claims, does not bar his pleadings of wire and mail fraud as predicate acts to his RICO claims.

To proceed with the mail and wire fraud as predicate acts, plaintiff must still demonstrate a scheme to defraud in each of his cases. Once plaintiff's sweeping allegations of grand fraud are stripped from the complaints, it is difficult to discern coherent schemes by defendants to defraud him. As the court has noted, the remaining fraud claims sound in breach of contract. However, the pleading standard defining a scheme to defraud is not itself precise. According to the Second Circuit, the "scheme to defraud" is measured by a "nontechnical standard" that is "a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general [and] business life of members of society." *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997) (quoting *United States v. Von Barta*, 635 F.2d 999, 1005 n.12 (2d Cir. 1980)) (internal quotation marks omitted). Any mailing incidental to an essential part of the scheme satisfies the mailing element even though the mailing itself contains no false or misleading representations. *SeeBridge*, 128 S.Ct. at 2138. Plaintiff alleges that defendants in both cases spoke of a "game plan" against him though he does not actually allege that Hoffman and the Mass Mutual defendants acted in concert to defraud him. Assuming that this "game plan" constituted some sort of scheme to defraud, plaintiff's RICO claim would still fail on the continuity requirement.

### b.    Continuity

A pattern of racketeering activity is established by showing, *inter alia*, that the acts amount to or "pose a threat of continued criminal activity." *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). A plaintiff can satisfy this continuity requirement by showing a "closed-ended" or an "open-ended" pattern of racketeering activity. A "closed-ended" pattern is a series of related predicate acts extending over a substantial period of time in the past. An "open-ended" pattern poses an ongoing threat of criminal conduct beyond the timeframe during which the predicate acts were performed. *Id.* at 241; *Spool,* 520 F.3d at 183; *Cofacredit*, 187 F.3d at 242.

### i.        Open-Ended Continuity

To demonstrate open-ended continuity, a plaintiff must show a threat of continuing criminal activity beyond the period during which the predicate acts were performed. *See Cofacredit*, 187 F.3d at 243.  The threat is presumed when the enterprise's business is primarily or inherently unlawful. *Id.* at 242-43.  There is no presumption of continued threat when the enterprise primarily conducts a legitimate business. *Id.* at 243.  When the defendant enterprise conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts implies a threat of continued criminal activity. *Id.*; *see also GICC Capital Corp. v. Tech. Fin. Group Inc.*, 67 F.3d 463, 466 (2d Cir. 1995) ("It defies logic to suggest that a threat of continued looting activity exists when, as plaintiff admits, there is nothing left to loot.").  Lastly, open-ended continuity is not sufficiently established where there is only a serious, discrete, and relatively short-lived scheme to defraud a few victims. *See Cofacredit*, 187 F.3d at 244.

In both of the instant causes of action, plaintiff challenges the manner in which the defendant insurers denied coverage on disability insurance policies.  A denial of coverage is not inherently unlawful.  Defendants, individually and collectively, are engaged in legitimate business: Reassure and Mass Mutual provide insurance coverage, which necessarily requires the review of policy claims.  Rentz, Sacco, DMS and Hoffman are employed or contracted to review insurance claims.  The alleged predicate acts of mail and wire fraud are few in number, directed at only plaintiff.  Defendants, having already denied his claims, can do no more harm against him.  There is no hint of any threat of continued criminal activity against him.  Plaintiff has not shown open-ended continuity necessary to establish a pattern of racketeering activity.

**ii.     Close-Ended Continuity**

Whether a closed-ended pattern of racketeering activity exists depends on a number of non-dispositive factors, including the length of time over which the alleged predicate acts took place, the number and variety of acts, the number of participants, the number of victims and the presence of separate schemes. *GICC Capital Corp.*, 67 F.3d at 467. Foremost among these factors is the duration of the racketeering activity. *H. J. Inc.*, 492 U.S. at 242 (describing close-ended continuity as a "centrally . . . temporal concept"). To establish close-ended continuity, a plaintiff must show "a series of related predicates extending over a substantial period of time." *Id*. The relevant period is the time during which the RICO predicate acts occurred, not the time during which the underlying scheme operated or the underlying dispute took place. *De Falco v. Bernas*, 244 F.3d 286, 321 (2d Cir. 2001). Since the Supreme Court decided *H. J. Inc.*, the Second Circuit has "never held a period of less than two years to constitute a substantial period of time." *Cofacredit*, 187 F.3d at 242 (internal quotation marks omitted). Though the two-year threshold is a not a "bright-line requirement," it is rare for conduct occurring for a shorter period of time to establish close-ended continuity, especially where the alleged conduct involves only a handful of participants and do not involve a complex, multi-faceted conspiracy. *Spool,* 520 F.3d at 184 (internal quotation marks omitted); *see also Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438, 446 (S.D.N.Y 1999) (predicate acts undertaken over twenty-three-month period held insufficient to state a closed-ended pattern of racketeering activity).

The amended complaint against the Life Reassure Defendants allege predicate acts of wire and mail fraud over a twenty-two-month period, which is insufficient to establish close-ended continuity under the Second Circuit's precedent. The substantial period in question began in August 2002 when plaintiff first spoke with Hoffman on the phone, and ended in June 2004

when plaintiff received what appears to be the last denial letter from Hoffman. Plaintiff claims that the period of continuity continues to this day because he is still denied monthly disability benefits, but this assertion is untenable because the period only covers predicate acts, not the time of operation of any underlying scheme to defraud. The RICO claim in his case against the Mass Mutual Defendants suffers from the same defect. From the first denial letter sent in September 2002 to the last denial letter in July 2004, the predicate acts spanned only twenty-two months.

Aside from duration of the predicate acts, the other nondispositive factors that affect the finding of closed-ended continuity also weigh against plaintiff. As previously noted, the participants in each case and the predicate acts are few in number. There is only one alleged victim—the plaintiff himself.[4] Viewed as a whole, the allegations are insufficient to state a closed-ended pattern of racketeering in either case. Plaintiff's RICO claim fails on this ground as well.

### 4. Section 1962(d) Conspiracy Claim

"Any claim under § 1962(d) based on conspiracy to violate other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." *See Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996) (quoting *Lightning Lube v. Witco Corp.*, 4

---

[4]       In the case against the Life Reassure Defendants, plaintiff asserts that his treating physician was another victim of defendants' racketeering activity. Plaintiff accuses Hoffman of first misleading the doctor into believing that plaintiff could only collect benefits if he were "totally disabled." The doctor was then induced to characterize plaintiff's claim for disability benefits as fraudulent and malicious. Later, when the doctor tried to backtrack from these comments and made findings more favorable to plaintiff's case, Hoffman reminded the doctor of his previous statements. This reminder, according to plaintiff, frightened the doctor into silence. Continuing with this argument, plaintiff argues that Hoffman's "extortion" deprived the doctor of the chance to earn fees as an expert witness at trial.

        Extortion is one of the recognized predicate acts that could support a RICO claim. To state a claim for extortion, however, the plaintiff must allege that the defendant "(1) induced [the victim], with [the victim's] consent, to part with property, (2) through the wrongful use of actual or threatened force, violence or fear (including fear of economic loss), (3) in such a way as to adversely effect interstate commerce." *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d Cir. 1992). There is no indication that Hoffman induced the doctor to part with any property. Plaintiff has not established extortion as a predicate act, and the doctor cannot be considered a victim of the alleged racketeering activity.

F.3d 1153, 1191 (3d Cir. 1993).  In both cases, plaintiff's section 1962(d) claims fail because he has not sufficiently alleged a claim under section 1962(c).

**IV.     Conclusion**

For the forgoing reasons, the two cases are designated as related, and defendants' partial motions to dismiss all other causes of action apart from the breach of contract claim are GRANTED.  The parties shall proceed forth with discovery on the remaining breach of contract claim under the supervision of United States Magistrate Judge Lois Bloom.

SO ORDERED.

Dated: Brooklyn, New York
        March 23, 2009

_____/s/_____
                    DORA L. IRIZARRY
                  United States District Judge